UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| POWERDSINE, INC. and POWERDSINE, LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> AMI SEMICONDUCTOR, INC. and AMI SEMICONDUCTOR BELGIUM BVBA, <br><br> Defendants. | Civil Action No. 07Civ. 6014(SAS) <br><br> **FIRST AMENDED COMPLAINT** |



Plaintiffs PowerDsine, Inc. and PowerDsine, Ltd. (collectively "PowerDsine" or "Plaintiffs"), by and through their undersigned attorneys, hereby complain of Defendants AMI Semiconductor, Inc. and AMI Semiconductor Belgium BVBA (collectively "AMIS") as follows:

## THE PARTIES

1. PowerDsine, Inc., a wholly owned U.S. subsidiary of PowerDsine, Ltd., is a corporation organized under the laws of the State of New York with its principal place of business in Melville, New York. PowerDsine, Inc. assists its parent, PowerDsine, Ltd., in the design of integrated circuits, modules and systems that enable the implementation of Power-over-Ethernet ("PoE") in local area networks ("LANs") and sells and supplies such integrated circuits, modules and systems.

2. PowerDsine, Ltd. is a corporation organized under the laws of Israel, with its principal place of business at 1 Hanagar Street, Hod Hasharon, Israel. PowerDsine, Ltd. designs and supplies integrated circuits, modules and systems that enable the implementation of PoE in LANs and sells some of its products in the U.S. and other countries through its U.S. subsidiary, PowerDsine, Inc.

3. Upon information and belief, Defendant AMI Semiconductor, Inc. is a corporation organized under the laws of Delaware, having its principal place of business located at 2300 Buckskin Road, Pocatello, Idaho.

4. Upon information and belief, Defendant AMI Semiconductor Belgium BVBA is a corporation organized under the laws of Belgium, having its principal place of business located at Westerring 15, B-9700 Oudenaarde, Belgium.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the matter in controversy exceeds the sum of $75,000.00, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

6. Venue is proper in this District pursuant to agreement by and amongst the parties.

## FACTUAL BACKGROUND

### *PowerDsine is the pioneer of Power-over-Ethernet Technology*

7. Plaintiffs market and sell industry leading components that provide, among other things, Power-over-Ethernet networks. Plaintiffs' customers regularly incorporate PowerDsine components into Ethernet network products sold on the open market. These components enable a system that incorporates these products to supply both data and electrical operating power over the same Ethernet network cable to a device that is connected to the LAN network. Accordingly, networking equipment that uses Plaintiffs' products are able to provide operating electrical power to end-devices, such as phones, cameras and wireless access points so

that there is no need to connect such end-devices to traditional electrical outlets. Plaintiff PowerDsine, Ltd., has been in business since 1994.

8.  PowerDsine, Ltd. was the pioneer of PoE technology and was the driving force that has led the data and voice networking industries to embrace PoE technology so that PoE will become a part of almost all Ethernet networking switching equipment ("Power Sourcing Equipment").

9.  PowerDsine derives more than ninety percent of its revenue from the sale of PoE products.

10. PowerDsine has been conducting research and development activities with respect to PoE technology for almost ten years.

11. PowerDsine has spent significant sums in excess of $50 million in business activities, including research and development, involving PoE.

12. The principal driving force behind PowerDsine's initial public offering in June 2004, where the company raised over $60 million, was centered around PoE technology.

13. In order to maintain its competitive edge, PowerDsine maintains much of its proprietary information confidentially. Due to its innovative, confidential proprietary information, PowerDsine has become the technological leader in the Power-over-Ethernet Market.

14. By no later than March, 2004, PowerDsine had invented and developed an integrated circuit that would enable Power Sourcing Equipment to, *inter alia*, deliver power to end-devices over Ethernet cables (hereafter "Product") and, in connection therewith, PowerDsine possessed the specifications, circuitry and other information and files relating to the design,

functionality, testing requirements and other information relating to the Product (hereafter "Product Information").

***Shimon Elkayam, A former PowerDsine Employee, Gained all of His PoE Technology Experience at PowerDsine and in Exchange Agreed not to Compete with PowerDsine***

15.     Mr. Elkayam was employed by PowerDsine, Ltd. between approximately December 2000 and December 2005.

16.     Prior to his employment at PowerDsine, Ltd., Mr. Elkayam did not have any professional or other experience with PoE technology.

17.     Mr. Elkayam was employed at PowerDsine, Ltd. as a Research & Development Engineer specializing in development of PoE technology.

18.     As a PowerDsine, Ltd. employee, Mr. Elkayam became a Senior Systems Designer and Architect of PoE integrated circuits, modules and systems.

19.     While employed by PowerDsine, Ltd., Mr. Elkayam gained PoE-related experience and benefited from the research and development activities conducted by PowerDsine prior to the time that he joined PowerDsine.

20.     While employed by PowerDsine, Ltd., Mr. Elkayam also benefited and gained PoE-related experience from research and development activities conducted by PowerDsine during the time that he was employed with the PowerDsine.

21.     As part of his employment agreement with PowerDsine, Ltd., Mr. Elkayam was privy to, received and had in his possession confidential and proprietary information of PowerDsine and about PowerDsine, including extensive information about products, and technology developed by PowerDsine as well as PowerDsine trade secrets.

22.     Mr. Elkayam obtained the foregoing confidential information, and other confidential information and trade secrets of PowerDsine, as a direct result of his employment

relationship with PowerDsine, Ltd. and because, prior to the commencement of his employment with PowerDsine, Ltd., he executed a confidentiality agreement and undertaking not to disclose any and all confidential information of PowerDsine both during his employment relationship and after termination thereof.

23. In order to induce PowerDsine to enable Mr. Elkayam to work at PowerDsine and learn PoE technology and obtain confidential information and trade secrets of PowerDsine, Mr. Elkayam also agreed that for a period of twenty-four months after the termination of his employment at PowerDsine, Ltd., he would not compete with PowerDsine or work for or provide any services to any company that competes with PowerDsine or develops, markets or sells products that compete with PowerDsine's products.

***AMIS, the Late-Comer to PoE Technology (A) Breached a Non-competition Agreement with PowerDsine, (B) Misappropriated Confidential Information of PowerDsine, and (C) Induced PowerDsine Employees to Breach Their Employment and Non-competition Agreements with PowerDsine***

24. In or about March, 2004, AMIS was in the business of manufacturing and assembling products in the electronic industry, and more specifically, customer-specific mixed-signal semiconductor products.

25. Based on its public filings, AMIS operates in two segments, Integrated Mixed Signal Products and Structured Digital Products. The Integrated Mixed Signal Products segment uses AMIS's wafer fabrication process technologies and the engineers of the Integrated Mixed Signal Product segment work hand-in-hand with the engineers in AMIS's internal fabrication facilities.

26. AMIS's internal fabrication facilities support mixed signal analog technologies such as the ones involving PoE products.

27. Upon information and belief, prior to at least March, 2004, AMIS did not possess the technical information, knowledge or experience required to design or manufacture PoE products or PoE semiconductor products.

28. In or about March, 2004, PowerDsine and AMIS sought to explore and evaluate the possibility of establishing a business relationship pursuant to which PowerDsine would engage AMIS as a design parter/subcontractor to manufacture PoE semiconductor products exclusively for PowerDsine based on PowerDsine's proprietary and confidential PoE technology, know-how, trade secrets and confidential information.

29. In order to establish this business relationship, the parties realized that it would be desirable for PowerDsine and AMIS to disclose confidential and proprietary information to each other.

30. In or about March, 2004, PowerDsine and AMIS, in order to induce each other to disclose confidential and proprietary information, undertook certain obligations of confidentiality and non-disclosure.

31. PowerDsine and AMIS acknowledged that the confidential information to be disclosed to each other would constitute a trade secret of, and was proprietary to, its discloser and could be used only for the purposes of manufacturing products solely for PowerDsine.

32. In or about August, 2005, PowerDsine and AMIS realized that in order to further proceed toward investigating the possibility of establishing a business relationship, PowerDsine would have to provide additional, extremely sensitive confidential information to AMIS.

33. PowerDsine decided that because of the sensitive nature of such confidential information, it would disclose such information only if AMIS would agree not to

compete with PowerDsine in the PoE field relating to products that are integrated into network switching equipment.

34. In order to receive such information, AMIS agreed not to compete with PowerDsine in the foregoing segment of the PoE market based on confidential information provided by PowerDsine.

35. As a result of AMIS's agreement not to compete, PowerDsine disclosed to AMIS PowerDsine's confidential and proprietary information, including the unique design specifications and features of PoE integrated circuits designed and developed by PowerDsine, as well as valuable confidential information about PoE technology which were developed by PowerDsine over years of research and development efforts.

36. Mr. Elkayam was the principal employee of PowerDsine, Ltd. who was in charge of the AMIS relationship and disclosure and provided to AMIS, pursuant to the agreements outlined above, the forgoing confidential and proprietary information of PowerDsine.

37. AMIS received and accepted this confidential PowerDsine information and even incorporated it into design documents bearing AMIS's insignia.

38. Upon information and belief, at approximately the same time it received PowerDsine's confidential and proprietary information, AMIS established a business relationship with Broadcom Corporation.

39. Broadcom Corporation ("Broadcom"), having a place of business at 5300 California Avenue Irvine, California 92617, is a company engaged in the highly competitive business of marketing and selling components that are incorporated into, among other things, data and voice networking equipment.

40.     Upon information and belief, during the time Mr. Elkayam was working with AMIS on behalf of PowerDsine, or shortly thereafter, Mr. Elkayam agreed to work for Broadcom Corporation, directly or through one of its European subsidiaries.

41.     Mr. Elkayam approached his managers at PowerDsine and informed them that his wife no longer desires to live in Israel and would like to move close to her family in Toulouse, France.

42.     Mr. Elkayam left PowerDsine in or about December, 2005, and informed PowerDsine that he was indeed moving to Toulouse, France and would not work in any way on PoE technology in order to honor the non-competition clause of his Agreement with PowerDsine.

43.     Upon information and belief, within weeks after departing from PowerDsine, Mr. Elkayam began his employment at Broadcom, directly or through one of its European subsidiaries.

44.     Upon information and belief, within months after working with AMIS on PoE as a PowerDsine employee pursuant to an appropriate confidentiality and non-competition agreement between AMIS and PowerDsine, Mr. Elkayam was working with AMIS on PoE as a Broadcom employee.

45.     By continuing to work with Mr. Elkayam on PoE, AMIS intentionally and knowingly circumvented the relevant agreements relating to confidentiality and non-competition that it had entered into with PowerDsine.

46.     Mr. Elkayam concealed from PowerDsine the fact that he was working for Broadcom and/or was providing PowerDsine's confidential and proprietary information to AMIS.

47. Late in 2006, when PowerDsine discovered that Mr Elkayam was employed by Broadcom, Mr. Elkayam continued to falsely assert to PowerDsine personnel who had occasion to run into him, that he does not work on PoE technology or products.

48. Upon information and belief, Mr. Elkayam was involved with the design and developmentof PoE products by AMIS.

49. Upon information and belief, Mr. Elkayam continues until the present time to provide AMIS with confidential and proprietary information of PowerDsine and continues to work with AMIS in violation of his non-competition agreement with PowerDsine.

50. Upon information and belief, Mr. Elkayam continues until the present time to assist and consult with AMIS in developing PoE products in breach of his agreements with PowerDsine.

51. Upon information and belief, AMIS knew or should have known that Mr. Elkayam was providing information to AMIS in violation of his agreements with PowerDsine.

52. On or before December, 2006 AMIS recruited Sharon Dagan ("Mr. Dagan"), another employee of PowerDsine, Ltd. who was involved with PoE technology and with the definition of PowerDsine's next-generation PoE products.

53. Prior to joining PowerDsine, Mr. Dagan did not have any PoE experience.

54. Mr. Dagan gained PoE-related experience at PowerDsine and benefited from the research and development and product marketing and product definition activities conducted by PowerDsine prior to the time that he joined PowerDsine.

55. Mr. Dagan also benefited and gained PoE-related experience from research and development activities as well as product marketing and definition activities conducted by PowerDsine after the time he joined PowerDsine.

56. As part of his employment agreement with PowerDsine, Ltd., Mr. Dagan was privy to, received and had in his possession confidential and proprietary information of PowerDsine and about PowerDsine, including extensive information about products, and technology developed by PowerDsine as well as PowerDsine trade secrets.

57. Mr. Dagan obtained the foregoing confidential information, other confidential information and trade secrets of PowerDsine as a direct result of his employment relationship with PowerDsine and because, prior to the commencement of his employment with PowerDsine, he induced PowerDsine to disclose such information by executing a confidentiality agreement and undertaking not to disclose any confidential information of PowerDsine, both during his employment relationship and after termination thereof.

58. In order to further induce PowerDsine to enable Mr. Dagan to work at PowerDsine, Mr. Dagan also agreed that for a period of 24 months after the termination of his employment at PowerDsine, he would not compete with PowerDsine or work for, or provide any services to, any company that competes with PowerDsine or develops, markets or sells any products that compete with PowerDsine's products.

59. Upon information and belief, AMIS knew about the foregoing agreements and covenants executed by Mr. Dagan.

60. Upon information and belief, AMIS recruited Mr. Dagan so that it would be able to gain an insight into confidential PowerDsine information and technology, including PowerDsine's product road-map and marketing plans.

61. Upon information and belief, Mr. Dagan was hired by AMIS shortly after he left PowerDsine.

62. Upon information and belief, AMIS needed such information in order to further its relationship with Broadcom.

63. Upon information and belief, Broadcom has recently entered the business of selling Power-over-Ethernet components internationally, in direct competition with PowerDsine.

64. Upon information and belief, AMIS manufactures PoE components for Broadcom, which Broadcom then sells and/or offers for sale as Broadcom products.

65. Upon information and belief, AMIS designs and/or manufactures PoE products for Broadcom based on confidential and proprietary information that it received from PowerDsine, including information provided by Mr. Elkayam and Mr. Dagan after each of them left PowerDsine.

66. Upon information and belief, certain Broadcom products, including but not limited to the BCM59101 Module, include certain unique design specifications and features that are based on information provided by PowerDsine to AMIS, directly and through Mr. Elkayam, both during his employment at PowerDsine, Ltd. and after he left such employment.

67. Upon information and belief, AMIS, through its newly formed High Voltage Communications Group, designs and sells the PoE integrated circuit developed by AMIS.

68. Upon information and belief, the High Voltage Communications Group of AMIS leverages significant resources and capabilities of AMIS from the entire organization in order to design, sell and manufacture its PoE integrated circuit products.

69. Upon information and belief, AMIS has told its investors that it believes the PoE integrated circuit market is capable of generating yearly revenue of $80 million.

70. Upon information and belief, AMIS produces and designs most of the mixed-signal integrated circuits out of its design center and foundry in Belgium and draws from design centers and other resources from throughout the organization.

71. PowerDsine personnel transferred confidential information and proprietary information and trade secrets to personnel working for the analog mixed signal design group which at the time was spread throughout design houses of AMIS located at several locations including, without limitation, facilities at Vilvoorde, Belgium, Oudenaarde, Belgium, Brno, Czech Republic, and Pocatello, Idaho.

## CLAIM ONE AGAINST AMIS: BREACH OF CONTRACT

72. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

73. PowerDsine disclosed to AMIS valuable confidential and proprietary information, which took almost ten years for PowerDsine to develop.

74. AMIS agreed not to use or disclose this information or to develop and market PoE products based on confidential and proprietary information received from PowerDsine.

75. AMIS breached its agreement by violating an undertaking not to compete and by misappropriating PowerDsine's confidential information.

76. As a result of AMIS's breach, PowerDsine has suffered and will continue to suffer damages.

## CLAIM TWO AGAINST AMIS:
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP WITH SHARON DAGAN

77. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

78. Since the time of his employment with PowerDsine, Mr. Dagan has had a valid Confidentiality and Non-Competition Agreement with PowerDsine, Ltd.

79. Upon information and belief, Defendant AMIS was fully aware of or should have been aware of the existence of Mr. Dagan's Confidentiality and Non-Competition Agreement.

80. Defendant AMIS wrongfully and intentionally induced Mr. Dagan to breach his Confidentiality and Non-Competition Agreement by offering Mr. Dagan employment with AMIS and by hiring him.

81. But for the wrongful acts of AMIS, Mr. Dagan would not have breached his Confidentiality and Non-Competition Agreement.

82. As a result of AMIS's wrongful conduct, Plaintiffs have suffered damages and will continue to suffer damages and irreparable harm if not enjoined by this Court.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs PowerDsine, Inc. and PowerDsine, Ltd. demand judgment against Defendants as follows:

A. Imposing preliminary and permanent injunctions enjoining AMIS from (a) further breaching its agreement with PowerDsine; and (b) engaging in any manufacturing, sale or assembly arrangement with Broadcom or any other seller or supplier in connection with PoE

products; (c) from having any further communications with Mr. Shimon Elkayam; and (d) from continuing to employ Mr. Sharon Dagan in any project or task relating to PoE; and (e) prohibiting anyone by or on behalf of AMIS from communicating with Mr. Dagan on anything relating to PoE for the duration of his non-compete agreement; and

B.     Awarding PowerDsine compensatory damages against AMIS for breach of contract in an amount to be proven at trial of not less than $150 million; and

C.     Awarding Plaintiffs their reasonable attorneys' fees, costs and disbursements in this action; and

D.     Granting Plaintiffs such other and further relief that this Court may deem just and proper.

Dated:   July 19, 2007
         New York, New York

CHADBOURNE & PARKE LLP

By_____
   Walter G. Hanchuk (WH-7096)
   Dennis C. Hopkins (DH-3767)
   30 Rockefeller Plaza
   New York, New York 10112
   (212) 408-5100

PowerDsine, Ltd.
    David Goren (DG-7760)
    General Counsel
    290 Broadhollow Road, #305
    Melville, NY 11747

*Attorneys for Plaintiffs*
PowerDsine, Inc.
PowerDsine, Ltd.